IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHERYL PERSON, *et al.*,

       Plaintiffs,

v.

Mayor and City Council of
Baltimore, *et al.*,

       Defendants.

\*

\*

\*

\*

\*

Civil Action No.: RDB 06-1447

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

On June 9, 2006, Cheryl Person, C. Michael Stahl, Eric Virro, Nathaniel Waisbrot, and

April Wuesch ("Plaintiffs") filed a Complaint and Motion for Temporary Restraining Order and

Preliminary Injunction against the Mayor and City Council of Baltimore and National Baptist

Convention USA, Inc. ("Defendants").  Plaintiffs' Complaint alleges that the Mayor and City

Council of Baltimore's (the "City") appropriation of funds in connection with a convention

organized by the National Baptist Convention USA, Inc. (the "National Baptist Convention")

violates the Establishment Clause of the First Amendment to the United States Constitution.  On

June 16, 2006, this Court conducted a hearing on Plaintiffs' Motion for Temporary Restraining

Order and Preliminary Injunction.  For the reasons stated in open court and further stated below,

Plaintiffs' motion was DENIED.

BACKGROUND

From June 19-23, 2006, the National Baptist Convention will hold its 2006 convention in

Baltimore, Maryland.  This convention is the largest organized convention in Maryland history.

(Bishop Aff. ¶ 8.)  It is expected to bring at least 50,000 people and $40,000,000 in direct

spending to Baltimore.  (*Id*.)

The National Baptist Convention is one of the largest religious conventioneers in the nation with approximately 7.5 million members.  (Compl. ¶ 11.)  Its corporate purposes include:

> (1)  To unite National Baptist churches, district associations, and state conventions in Christian evangelism so as to fulfill the Great Commission of our Lord and Savior Jesus Christ through preaching, teaching, and healing; (2) To promote home and foreign mission efforts; (3) To encourage and support Christian education; (4) To publish and distribute Sunday School and other Christian literature, music, and other works of art and religious expression; and (5) To engage in any other endeavors deemed fitting and proper in order to advance the cause of Jesus Christ throughout the world.

(*Id*.)  The motto of the National Baptist Convention is "Jesus Christ Only, Always."  (*Id*.)

On May 15, 2006, the Baltimore City Council approved the following appropriation (Bill 06-0364):

> BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF BALTIMORE, That $297,500 shall be made available to the MR-Civic Promotion — Program 590 (Civic Promotion) as a Supplementary General Fund Operating Appropriation for Fiscal Year 2006, to provide funding for support of the 2006 National Baptist Convention, "Feed the Hungry Event", activities. The source of revenue for this appropriation is from the Fiscal 2005 Fund Balance in excess of the amount from this source that was relied on by the Board of Estimates in determining the tax levy required to balance the budget for Fiscal Year 2005.

(Compl. ¶ 22.)  On June 2, 2006, Baltimore Mayor Martin O'Malley signed Bill 06-0364 into law. (*Id*. at ¶ 25.)

On June 6, 2006, Plaintiffs' counsel wrote a letter to the City indicating that the "appropriation to the National Baptist Convention (Legislative File No. 06-0364) . . . violates the Establishment Clause of the First Amendment to the U.S. Constitution by funding the National Baptist Convention's religious activities, thus sending the message to Baltimore residents that

their local government favors one faith over others and prefers religion to nonreligion."

(Katskee Aff. Ex. C.)  The letter focused on the "Feed the Hungry Event":

> During the Feed-the-Hungry Outreach, which will take place on June 17, members of the Convention will deliver to Maryland missions and shelters "bags of love" that will be "filled with food, a Bible and salvation tracts."  In other words, the delivery of food is inextricably intertwined with the National Baptist Convention's evangelical activities and is being performed in the service of the Convention's religious mission to proselytize and gain adherents to one particular faith.

(*Id.* (citations omitted).)  The letter closed by requesting a response "by close of business June 7."  (*Id.*)

On June 7, 2006, the City wrote a letter to Plaintiffs' offering "clarification regarding Baltimore City Council Bill 06-0364."  (Katskee Aff. Ex. E.)  The letter explained that:

> The City has a compelling secular interest in promoting travel, tourism, and economic development in the City.  This opportunity is unprecedented to host the largest convention of any kind possibly ever held in the State of Maryland.  The City intends to provide financial assistance to the event to facilitate the use of the Baltimore Arena and other activities, since the event will clearly be integral to the economic development of the City.  The City has provided subsidies to other conventions, such as recent large gatherings of square dancers and Shriners.  The subsidies are based on neutral and secular criteria, such as the size of the convention and number of attendees.  In fact, the extreme competitiveness of the convention market makes such subsidies critical to the attraction of almost any sizable convention.

(*Id.*)  Finally, the letter noted that "[h]ere, the City does not review or monitor the convention or its activities.  There is minimal administrative cooperation."  (*Id.* (citation omitted).)

On June 9, 2006, Plaintiffs filed a Complaint with this Court.  Plaintiffs filed two other documents on June 9: Motion to File Redacted Complaint and File Non-Redacted Complaint Under Seal, and Motion for Temporary Restraining Order and Preliminary Injunction.  On June

16, 2006, this Court conducted a hearing with respect to Plaintiffs' outstanding motions.  At the hearing, this Court GRANTED Plaintiff's unopposed Motion to File Redacted Complaint and File Non-Redacted Complaint Under Seal (Paper No. 3) and DENIED Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Paper No. 4).[1]

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 65, the decision whether to issue a preliminary injunction is committed to the sound discretion of the trial court.  *See Hughes Network Sys. v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).  "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it."  *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation and citation omitted).  In determining whether to grant a preliminary injunction the district court is forced to act on an incomplete record and order a party to act, or refrain from acting, in a certain way.  *See Hughes Network Sys.,* 17 F.3d at 693.  As a result, "the danger of a mistake" in this setting "is substantial."  *See id.* (quoting *American Hosp. Supply Corp. v. Hospital Prods., Ltd.,* 780 F.2d 589, 593 (7th Cir. 1986)).

To determine whether a preliminary injunction is appropriate, the court must consider the following four factors established by the United States Court of Appeals for the Fourth Circuit in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir. 1977): (1) the likelihood of irreparable harm to the plaintiff if the injunctive relief is denied; (2)

---

[1]      The following attorneys were present at the hearing: Richard B. Katskee and Heather L. Weaver, on behalf of Plaintiffs; David E. Ralph and Kary Berkeley Kaye, on behalf of the City; and André L. Dennis, on behalf of the National Baptist Convention.

the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits of the action; and (4) the public interest.  *See also Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991); *Hughes Network Sys.*, 17 F.3d at 693 (citing *Blackwelder,* 550 F.2d at 193-95).

The Fourth Circuit has established what is known as the hardship balancing test and this test places special importance on the first two factors of the *Blackwelder* analysis.  *See Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997) (citing *Direx,* 952 F.2d at 812).  To conduct the hardship balancing test, the district court must weigh the first two factors regarding the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied and the harm to the defendant if granted.  *See id.*  The harm demonstrated by the plaintiff must be neither remote nor speculative, but actual and imminent.  *See id.*  Furthermore, harm is not "irreparable" if it can be compensated by money damages during the normal course of litigation.  *See Hughes Network Sys.,* 17 F.3d at 694.

After the hardship balancing test is completed, the district court determines the degree to which the plaintiff must demonstrate a likelihood of success on the merits.  *Manning*, 119 F.3d at 263.  There is a "sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa." *Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 526 (4th Cir. 2003); *see also Direx*, 952 F.2d at 812-13 (citing *Rum Creek Coal Sales, Inc.*, 926 F.2d at 359).  Lastly, the district court must consider whether a preliminary injunction would be in the public interest.

<u>DISCUSSION</u>

I.      **The *Blackwelder* Factors.**

Applying the *Blackwelder* factors in this case requires focusing on Plaintiffs' ability to demonstrate a likelihood of success on the merits.  For example, Plaintiffs' ability to make a clear showing with respect to the first factor—irreparable harm to the moving party—turns on establishing a likelihood of success on the merits of their Establishment Clause claim.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even a minimal period of time, unquestionably constitutes irreparable injury."); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978)("Violations of first amendment rights constitute *per se* irreparable injury.").  Accordingly, this Court focuses primarily on the third factor under *Blackwelder*: the likelihood that Plaintiffs will succeed on the merits of the action.  Because the Court's inquiry results in concluding that Plaintiffs have *not* demonstrated a likelihood of success on the merits, this Court does not address the other *Blackwelder* factors in significant detail.[2]

II.     **Likelihood of Success on the Merits.**

     A.      **Legal Principles.**

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion."  United States Constitution, Amendment I.  The Establishment Clause

---

[2]      This Court notes that evaluation of the fourth factor—whether the public interest favors granting preliminary relief—is also dependant on a demonstration of likely success on the merits.  The reason is that the primary public interest at issue is upholding constitutional rights. (*See* Pls' Mem. pp. 42-43.)  In addition, the second factor—which involves assessing the likelihood of harm to the non-moving party—is significant.  For example, the City would suffer harm to its reputation and good will if this Court were to grant Plaintiffs' request for preliminary relief.  In addition, the National Baptist Convention would have to identify funds to pay for the various costs that the City's incentive package is designed to reduce.  At the hearing, counsel to the National Baptist Convention represented that procuring such funds is no simple matter.

"prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. Amer. Civil Liberties Union*, 492 U.S. 573, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring))**.**

In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court established a three-part test to determine whether government action constitutes an endorsement of religion. Government action does not violate the Establishment Clause if: (1) the action has a secular purpose; (2) the principal or primary effect of the action neither advances nor inhibits religion; and (3) the action does not foster excessive government entanglement with religion. *Lemon*, 403 U.S. at 612-13; *Agostini v. Felton*, 521 U.S. 203 (1997). To pass muster under the Establishment Clause, a challenged government action must satisfy each of the *Lemon* test's three criteria. *See Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 270 (4th Cir. 2005).

**B.**     **Application.**

The governmental action that Plaintiffs challenge consists of an incentive package that the City agreed to provide the National Baptist Convention in return for holding their 2006 convention in Baltimore, Maryland. Specifically, the City represents to this Court that it agreed to provide the following incentives: (1) the City will discount the price of its arena by $195,000; (2) the City will provide up to $100,000 for actual costs related to transportation; and (3) the City will provide $5,000 to feed hungry people in Baltimore at a pre-convention event involving representatives of the national convention. (*See* City Opp. p. 3.) As one affidavit submitted by the City provides:

> The $195,000 represents the amount by which the cost of the arena
> will be discounted.  It will not be cash paid to the [National Baptist

Convention].    Any payments related to supplementing actual transportation costs of the convention will be paid directly to the transportation providers only upon receipt of appropriate documentation.  None of the up to $100,000 will be paid to the NBC. The $5,000 supplement for the 'Feed the Hungry Event' is to be used to provide food to indigent residents of Baltimore, and will be paid upon proper documentation.

(Bishop Aff. ¶ 7.)[3]  Another affidavit provided by the City states that:

There will not be any Bibles or religious material provided with the [Feed the Hungry Event].   The event is simply to provide less fortunate members of the Baltimore community who are in need of subsistence with a single meal prior to the other scheduled events of the Convention.

(Coger Aff. ¶ 4.)[4]  Although Plaintiffs' papers focus primarily on the "Feed the Hungry Event," Plaintiffs made clear at the hearing that their Establishment Clause challenge extends to each of the incentives described above.

### 1.    First Factor of *Lemon* Test—Secular Purpose of Action.

The record before this Court indicates that the incentive package that the City agreed to provide the National Baptist Convention has a secular purpose.  The City proffers that the legitimate secular purpose for that incentive package at issue is economic development through travel tourism and, more specifically, bringing conventions, trade shows, and associations to Baltimore.  (*See* City Opp. pp. 7-8 ("The rationale for the incentives here was to draw to Baltimore a convention of fifty thousand people, and to secure for the City and the State the

---

[3]       Clarence T. Bishop is past Chairman of the Board for the Baltimore Area Convention and Visitors Association ("BACVA"), the Mayor of Baltimore's Chief of Staff, and senior representative on economic development.

[4]       Dr. Charles Coger is Chair of the Local Host Committee for the 2006 National Baptist Convention.

financial benefits of such a well-attended convention.").)  The City also notes that "the transportation incentive responds to the likely impact of the 50,000 convention visitors on the public services ordinarily provided by local and state government."  (*Id.*)  Plaintiffs do not seriously challenge the evidence submitted by the City.  Accordingly, this Court finds that the City satisfied the "fairly low hurdle" of providing a "legitimate secular purpose" for the challenged governmental action, in this case the City's incentive package to the National Baptist Conventions.  *Lambeth*, 407 F.3d at 270 (citations omitted).[5]

> **2.      Second Factor of *Lemon* Test—Principal or Primary Effect of Aid Neither Advances nor Inhibits Religion.**

To determine whether governmental action has the effect of advancing religion, courts consider whether the action (1) results in governmental indoctrination; (2) defines its recipients by reference to religion; or (3) creates an excessive entanglement with religion.  *See Agostini*, 521 U.S. at 234.  In addition, as was extensively discussed at the hearing, the Fourth Circuit has stated the following with respect to the "pervasively sectarian" and "neutrality plus" tests:

> [A]lthough Justice O'Connor and Justice Breyer would not go as far as the plurality, their separate opinion establishes three fundamental guideposts for Establishment Clause cases.  First, the neutrality of aid criteria is an important factor, even if it is not the only factor, in assessing a public assistance program.  Second, the actual diversion of government aid to religious purposes is prohibited.  Third, and relatedly, "presumptions of religious indoctrination" inherent in the

---

[5]      This Court rejects Plaintiffs' argument that the Establishment Clause prevents a city government from giving any aid of any kind to a convention that is sponsored by a religious organization such as the National Baptist Convention.  *Cf. Bowen v. Kendrick*, 487 U.S. 589, 606-610 (1988) (government funds may be granted to religious organizations where organizations provide valuable social welfare services in secular fashion); *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 842-43 (1995) (where aid is given through provision of services, rather than direct disbursement of funds, courts must examine nature of the benefit derived by recipient, not propriety of indirect expenditure of funds).

> pervasively sectarian analysis "are normally inappropriate when
> evaluating neutral school-aid programs under the Establishment
> Clause." The O'Connor concurring opinion, which is the controlling
> opinion from *Mitchell*, replaced the pervasively sectarian test with a
> principle of "neutrality plus." Neutrality is a necessary and important
> consideration in judging Establishment Clause cases, but it may not
> be sufficient in and of itself. Instead, courts must examine whether
> actual diversion of aid occurs and whether the "particular facts of
> each case" reveal that the Establishment Clause has been violated.

*Columbia Union College v. Oliver*, 254 F.3d 496, 504 (4th Cir. 2001) (citations omitted).

The record before this Court indicates that the incentive package negotiated by the City does not have the effect of advancing religion. First, the City appears to have applied neutral criteria in selecting the National Baptist Convention as the recipient of aid. As one affidavit submitted by the City provides:

> [Baltimore Area Convention and Visitors Association ("BACVA")]
> uses certain neutral criteria when negotiating all incentives for trade
> shows and associations. These factors focus on: (1) the size of the
> convention; (2) spending power of the association or trade show; and
> (3) impact on the City's public safety and welfare concerns. These
> factors are applied to all associations and trade shows when
> negotiating any incentive packages. No factors involving religion or
> lack of religion are considered.

(Bishop Aff. ¶ 5.) The affidavit also states that "[t]he City's sole purpose in providing the incentives is to promote the City's interest in economic development through travel and tourism." (*Id*. at ¶ 9.) Finally, "BACVA has negotiated similar incentive packages with other large conventioneers including the Shriners of North America which had 25,000 conventioneers." (*Id*. at ¶ 10.)

This Court has considered Plaintiffs' argument that the criteria identified by the City are insufficient under *Columbia Union College v. Oliver*, 254 F.3d 496 (4th Cir. 2001). In that case, which dealt with a program that issued grants of public aid to private colleges, the neutral

selection criteria were set forth in a statute.  *Id*. at 505.  Here, of course, the neutral criteria are

not established by statute.  This Court cannot find, however, a requirement in *Columbia Union*

that the selection criteria be identified by statute.[6]  In this case, moreover, the Court has no

reason to question the affidavits provided by the City.  Finally, as counsel for the City pointed

out, the tourism and convention business is significantly different in nature than programs that

issue grants upon application.  Those differences may explain why, for example, the city

ordinance was passed after the National Baptist Convention agreed to come to Baltimore.

Second, in this case there is no evidence of actual diversion of government aid to

religious purposes.  As a preliminary matter, the National Baptist Convention has not yet

received any money from the City.  Therefore, "it is impossible for [Plaintiffs] to make the

requisite showing of actual diversion. . . ."  *Columbia Union*, 254 F.3d at 506.  In addition, the

only component of the incentive package that is a direct grant of cash is the money for the Feed

the Hungry Event.  That event consists of a lunch for indigent residents of Baltimore only, and

will not be accompanied by any religious material.  (*See* Coger Aff. ¶ 4.)  Finally, this Court

instructed the City to ensure that all participants in the Feed the Hungry Event are notified that

they are prohibited from engaging in any religious solicitation or distributing any religious

materials as part of that event.[7]

---

[6]      In at least one case, the Supreme Court found that neutral selection criteria that
were not set forth in a statute did not violate the Establishment Clause.  *See Rosenberger*, 515
U.S. at 824 & 840-42 (1995) (concluding that University of Virginia guidelines governing a
student activities fund were neutral toward religion).

[7]      On June 16, 2006, the City filed a letter indicating that it will comply with the
Court's instruction.  (*See* Paper No. 18.)  The letter states that "[a]ttached is a notice that should
be posted at the Feed the Hungry Event site, and read to all participants in the event, to make
sure that it is understood that the $5,000 supplement by the City is contingent upon the event not

Third, there are safeguards associated with the incentives that the City provided to the National Baptist Convention.  With respect to two of the three incentives—the arena discount of $195,000 and the transportation costs of $100,000—there is no danger of diversion to religious purposes because these incentives simply cannot be diverted.  For example, the arena discount will be applied to the City's bill to the National Baptist Convention for use of the City's convention center.  Similarly, the transportation aid will be paid directly to the transportation providers, not to the National Baptist Convention.[8]  With respect to the final incentive—the

_____

including Bibles, ministering, witnessing, scriptures, invitations to religious events, or any other religious materials or messages." (*Id.*)  The notice to be posted provides:

> AS YOU MIGHT BE AWARE, THE NATIONAL BAPTIST CONVENTION AND THE CITY HAVE BEEN SUED IN FEDERAL COURT OVER THE FEED THE HUNGRY EVENT.  THE COURT HAS ORDERED THE CITY TO INSTRUCT THAT THE CONVENTION AND ALL PARTICIPANTS IN THE FEED THE HUNGRY EVENT ARE PROHIBITED FROM ENGAGING IN ANY RELIGIOUS SOLICITATION OR DISTRIBUTION OF ANY RELIGIOUS MATERIALS AS PART OF THAT EVENT.  THE CONVENTION HAS ASSURED THE CITY AND THE COURT THAT THE FEED THE HUNGRY PROGRAM WILL NOT INCLUDE BIBLES, MINISTERING, WITNESSING, SCRIPTURES OR ANY OTHER RELIGIOUS MATERIALS OR MESSAGE.  PARTICIPANTS IN THIS PROGRAM MUST HONOR THESE INSTRUCTIONS AND NOT DO ANY OF THESE THINGS WHILE FEEDING THE HUNGRY.   ALSO, PARTICIPANTS CANNOT, DURING THE FEED THE HUNGRY EVENT, ANSWER ANY QUESTIONS, FROM ANYONE PROVIDED A LUNCH, THAT INVOLVES RELIGION.  You may inform persons that the lunch is from the National Baptist Convention and that you hope it makes their lives a little better.

(*Id.*)

[8]     On May 26, 2006, Attorney General for the State of Maryland J. Joseph Curran, issued a formal legal opinion addressing the constitutionality of appropriating funds in connection with the National Baptist Convention.  *See* 91 Op. Att'y, 6/26/06, pp. 118-24.  The funds at issue included  $150,000 to support "the transportation costs of safely and efficiently moving 50,000 people throughout the region."  *Id.* at 120.  The opinion concludes that:

$5,000 that will purchase food for the Feed the Hungry Event—the affidavit submitted by the City indicates that these funds will only be paid upon appropriate documentation, *i.e.*, receipts for food.  Moreover, as was noted above, this Court instructed the City to ensure that all participants in the Feed the Hungry Event are notified that they are prohibited from engaging in any religious solicitation or distributing any religious materials as part of that event.[9]

### 3.    Third Factor of *Lemon* Test—Excessive Government Entanglement with Religion.

After representing that the second factor of the *Lemon* test has been essentially "folded into the 'effect' prong" under *Agostini v. Felton*, 521 U.S. 203 (1997), Plaintiffs argued that a

---

> [I]t is possible for the State to expend the appropriation without offending the Establishment Clause.  In particular, funds may be expended for the specific purpose you have identified— transportation funds—under a grant agreement that restricts the use of the funds and imposes appropriate controls.

91 Op. Att'y, 6/26/06, p. 118.  At the hearing, Plaintiffs acknowledged that they contemplated, but ultimately decided against, initiating litigation against the State of Maryland.

[9]    This Court's analysis would not differ under the pervasively sectarian analysis. Funding of a sectarian institution is not forbidden when the inherently religious nature of the institution can be separated from its secular work.  As the Supreme Court has explained, "*Hunt* requires (1) that no state aid at all go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones, and (2) that if secular activities can be separated out, they alone may be funded." *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 755 (1976) (citing *Hunt v. McNair*, 413 U.S. 734, 743 (1973)).  There is no inherently religious aspect to the Feed the Hungry Event.  *See* DISCUSSION § II.B.2, *supra* (explaining that this event will not be accompanied by any religious material, and noting this Court's instruction to the City to ensure that all participants in the event are notified that they are prohibited from engaging in any religious solicitation or distribution of religious materials).  The other incentives at issue here—the arena discount and the transportation costs—are subjected to a different analysis.  *See, e.g.*, *Bowen v. Kendrick*, 487 U.S. 589, 608-09 (1988) ("In other cases involving indirect grants of state aid to religious institutions, we have found it important that the aid is made available regardless of whether it will ultimately flow to a secular or sectarian institution.") (citation omitted).

reasonable person viewing the public history of the ordinance passed by the City, as well as the website maintained by the National Baptist Convention, would conclude that the appropriation at issue here constitutes an endorsement of religion.  *See*, *e.g.*, *Wallace v. Jaffree*, 472 U.S. 38, 76 (1985) ("The relevant issue is whether an objective observer, acquainted with the text, *legislative history*, and implementation of the statute, would perceive it as a state endorsement of [religion].") (emphasis added).

In this case, an objective observer familiar with the legislative history of City Council Bill 06-0364 would not perceive that appropriation as a state endorsement of religion.  City Council Bill 06-0364  provides:

> BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF BALTIMORE, That $297,500 shall be made available to the MR-Civic Promotion — Program 590 (Civic Promotion) as a Supplementary General Fund Operating Appropriation for Fiscal Year 2006, to provide funding for support of the 2006 National Baptist Convention, "Feed the Hungry Event", activities. The source of revenue for this appropriation is from the Fiscal 2005 Fund Balance in excess of the amount from this source that was relied on by the Board of Estimates in determining the tax levy required to balance the budget for Fiscal Year 2005.

First, as the City's counsel acknowledged at the hearing, Bill 06-0364 is inartfully drafted.  This appropriation, however, does not contain any language that would appear to endorse a specific religious purpose.  Second, the legislative history associated with Bill 06-0364 confirms that there is no religious purpose associated with the incentive package at issue in this case.  (*See* City Opp. Ex. D-I.)[10]  As noted at the hearing, Plaintiffs have not launched any serious challenge

---

[10]      The legislative history makes clear that the City's incentive package is not limited to the Feed the Hungry Event.  (*See* City Opp. Ex. D ("Specifically the City funding will be used to support a number of convention activities at the 1st Mariner Arena, subsidize local transportation and will underwrite the cost for a one-time 'Feed the Hungry Event', that the

to the City's observations with respect to Bill 06-0364's legislative history.  Accordingly, this

Court concludes that an objective observer familiar with City Council Bill 06-0364 and its

legislative history would not perceive that bill as a state endorsement of religion.

<u>CONCLUSION</u>

For the reasons stated in open court on June 16, 2006 and further stated above, Plaintiff's

Motion for Temporary Restraining Order and Preliminary Injunction is DENIED.  A separate

Order follows.


Dated: June 19, 2006                                /s/_____

                                                    Richard D. Bennett
                                                    United States District Judge

---

group will hold for the homeless.").)